[Civ. No. 3491. Third Appellate District.—April 18, 1928.]

GILMAN F. O'NEILL, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

Wallace Rutherford for Petitioner.

G. C. Faulkner and R. P. Wisecarver for Respondents.

PLUMMER, J.—Upon the application of the petitioner this court heretofore issued its order directing the respondent Industrial Accident Commission to certify to this court a transcript of the record of the proceedings had before said body wherein it was found that the petitioner was not entitled to be reimbursed for his reasonable medical and hospital treatment after the twenty-third day of September, 1927, and further found that on said date the petitioner unreasonably refused medical treatment tendered him by the insurance carrier, and further finding that the failure of the employee to submit to hospitalization and medical care in San Francisco and his insistence upon the chiropractic treatments is unreasonable, and the insurance carrier is not liable for such portion of disability or death caused,

continued or aggravated by such refusal of medical treatment, and thereupon limiting the award to the petitioner herein to the sum of $16.67 a week beginning as of September 11, 1927, as disability indemnity.

The record shows that the petitioner, prior to and on the third day of September, 1927, was a laborer employed by Charles H. Gildersleeve of Mendocino County near the town of Covelo. That on said date the petitioner was riding with a truck driver on a truck going after a load of lumber, when by some means the truck was overturned and the petitioner received an injury to the twelfth dorsal vertebra resulting in paralysis from the hips down. That at the time of his employment petitioner was receiving a wage of $27 per week. Immediately after the injury Charles H. Gildersleeve employed one Dr. Osborne to care for the petitioner. Dr. Osborne gave the petitioner a narcotic to allay the pain, treated the cuts and abrasions on the petitioner's body, assuring him that he was suffering from shock and would soon recover the use of his limbs. Dr. Osborne did nothing further and went away on a camping trip without making any arrangements for the care of the petitioner, the petitioner being left in a bunkhouse at the camp belonging to the employer. On September 4, 1927, Dr. Hogshead of Covelo was called into the case. He treated the cuts and abrasions for the period of two weeks, caused the petitioner to be removed to a private hospital operated by a practical nurse, but other than taking care of the immediate daily necessities of the petitioner and caring for the cuts and abrasions, did nothing toward caring for petitioner's spine or to relieve the petitioner from the paralysis above mentioned. This continued for a period of about two weeks, during which period of time the employer visited petitioner occasionally, knew of petitioner's physical condition, but neither the employer nor the insurance carrier made any arrangements for, nor performed any act toward taking proper care of the petitioner or giving him proper medical or surgical treatment. After the lapse of about two weeks the relatives of the petitioner, learning of his condition, caused him to be moved to the city of Napa and placed in the home of a trained nurse, where three doctors were called into the case. It appears that Dr. Virginia Enos, a chiro-

practor, was employed to reduce the dislocation of the twelfth dorsal vertebra. Dr. Welty was first called to look after the physical condition of the petitioner, and subsequently Dr. Dawson.

The record shows that Dr. Welty, after being called upon the case, made some arrangements, not disclosed, to remove the petitioner to a hospital and engaged the services of an ambulance to be used in such removal. This appears, however, to have been done without any consultation with the petitioner or any of his relatives who had brought him from Covelo to Napa. Dr. Welty then retired from the case. Subsequent to this it appears that Dr. Dawson prescribed for the petitioner and Dr. Enos gave chiropractic treatments to reduce the spinal dislocation. The record also sets forth that X-ray photographs were taken of the petitioner's spine while at Napa, and the record contains photostatic copies thereof. On or about the 23d day of September, 1927, an agent of the insurance carrier, in conference with the mother, father, and sister of the petitioner, at Napa, tendered the treatment of a specialist in San Francisco, the name of the specialist not being given. This tender was not accepted. The record, however, shows that the offer was not made personally to the petitioner, and that the petitioner did not hear anything about such offer. On the third day of October, 1927, the insurance carrier filed with the Industrial Accident Commission an application for adjustment of the claim of the petitioner that might be made under the Workmen's Compensation Law of the state, setting forth the injury suffered by the petitioner, the fact of his still being disabled, and seeking to have its liability limited on the theory that the employee had unreasonably refused to submit to medical or surgical treatment, etc. Upon this hearing it is contended that the findings of the Commission are not supported by the testimony, that the conclusion based thereon is therefore erroneous, and that the matter should be returned to the Commission for further hearing. That the petitioner in this case was neglected by the employer for the period of at least two weeks after his injury is a conceded fact, and that during said period of time, no proper medical treatment, and in fact no proper treatment of any kind was given

the petitioner, and that under such circumstances, as the act provides, the petitioner was justified in obtaining treatment.

■ The findings and conclusion of the Commission appear to be based upon the following letter written by Dr. Harbaugh, M. D., in response to a memorandum previously submitted by the Commission:

"San Francisco, Oct. 26, 1927.
"Attention, Mr. Campbell
    "Subject: Gilman F. O'Neill—Claim No. 23646

"In answer to your memorandum of October 25th, I would state that in my opinion the man's refusal to accept the treatment tendered by the insurance company is unreasonable and should be so interpreted by the Industrial Accident Commission. I do not believe that at this time we should enter into any discussion as to whether he has been benefited by the treatment of the chiropractor. I believe it would be unfair to the insurance carrier and, in my opinion, against the best interests of the man to make any other decision in the case.

"R. W. HARBAUGH, M. D.
"RWH:LD                    Asst. Medical Director."

While this letter was proper to be considered by the Commission, the conclusion therein stated, or the opinion expressed, or the direction as to how the act of the petitioner should be interpreted, must be read in the light of the record. Dr. Harbaugh's letter to the effect that "the man's refusal to accept the treatment tendered by the insurance company is unreasonable" can only be given weight by assuming that the insurance carrier had tendered some treatment. As we have stated, however, the record shows without any question that the insurance carrier never tendered the petitioner any treatment whatever. An agent of the insurance carrier did have a conversation with certain relatives of the petitioner, but information concerning the same was never conveyed to the petitioner. The record shows that the petitioner was over twenty-three years of age, and nothing appears in the record showing why he might not have been individually consulted or the tender made to him personally. At the time of the hearing in October, 1927, and the taking of testimony in relation to

the application filed by the insurance carrier, the record discloses that the referee had some conversation with the injured man which, however, constituted no tender on the part of the insurance carrier, as will appear by the following excerpts which we set forth: (By the Referee): "Mr. O'Neill, what is your attitude in the event that the insurance company should tender you the names of three physicians, approved by the Commission, or recognized by the Commission, as qualified to treat your particular injury, for your spine, and a neurologist, who are capable of treatment of the spinal cord or nerve injury, and hospitalization in a hospital in San Francisco, under the belief that by such hospitalization and under the care of those capable of treatment of your condition, would you reject such treatment?" To which the injured man replied: "Well, now, you mean the way I feel like now, the way I am progressing, at the present state of progress I would not. Q. What you mean is that you would rather continue in your present treatments so long as you are actually improving? A. Yes. Q. My question is assuming the tender of three, three under the law, if you are dissatisfied with the physician treating you, you are entitled to ask for three, so assuming all these qualifications to be established, would you or would you not accept? A. Well, it is a hard question to answer, because if I continue to improve, I don't see why I should have a change. Referee: The first question is as to whether he would or would not accept. Now there is this weakness in the situation, that a tender according to the terms I have outlined has not been made." After some conversation as to the fact that no tender had actually been made by the employer or the insurance company, the referee asked the injured man the following question: "Am I to understand, Mr. O'Neill, from your statement, that your refusal of medical treatment of the type indicated is subject to revision in the event that diagnostic examination would indicate that your improvement was not an actuality as far as the spinal condition is concerned—your feeling on the matter to the contrary notwithstanding? Have I made myself clear? A. Well, I will repeat. You mean if this tender, this offer, which I refused, if it wasn't proved to me that the condition hadn't improved? Q. If it were shown. What is your

answer? A. Well, now, if it could be shown it had not been improved, why certainly the treatment would be changed in that case." Here follows some testimony in relation to the X-ray pictures which it was stipulated should be submitted to Dr. Harbaugh for examination and report thereon.

Under the state of the record in this case, as shown by the foregoing, the question of whether the petitioner was or was not receiving proper treatment or whether chiropractic treatment for the employee's injury to the spine was or was not proper under the circumstances or such as should have been given, or whether a surgical operation should have been performed, becomes wholly immaterial in view of the fact that no tender of medical or surgical treatment was ever made by either the employer or insurance carrier, for the injured man to refuse, and therefore the opinion of Dr. Harbaugh "that the man's refusal to accept the treatment tendered by the insurance company is unreasonable" has absolutely nothing upon which to rest. ■ No contention is made by the petitioner that he is entitled to recover his costs and expenses incurred for the services rendered by the chiropractor, but that he is entitled to compensation for the services performed by his nurse and also for the medical treatment given him by Dr. Dawson, which contention, under the facts disclosed by the record, should have been sustained. As we have stated, the record showing that nothing else was tendered, we cannot escape the conclusion that there is nothing in the record to support the last sentence of Finding Number 3 of the Commission, which reads: "On said date (referring to September 23, 1927), the employee unreasonably refused medical treatment tendered him by the insurance company, and is not entitled to be reimbursed for any expenses thereafter incurred." Nor is there any testimony in the record to support Finding Number 4 of the Commission, which reads: "The failure of the employee to submit to hospitalization and medical care in San Francisco and his insistence upon chiropractic treatments is unreasonable, and the insurance carrier is not liable for such portion of disability or death caused, continued or aggravated by such refusal of medical treatment." We may also add that there is nothing in the record which indicates that the employee would not submit readily to an

examination as provided for in section 16 of the Compensation Act for the purpose of ascertaining whether his condition is being improved, or what other or different treatment should be given, if any, or whether any surgical operations should be performed. ▮ It was contended upon the argument that by reason of neglect on the part of the employer and the failure to make tender by the insurance carrier of proper medical treatment until after the petitioner had secured treatment for himself, that the right of the insurance carrier now to make such tender and present to the Commission proof of what treatment should be given, is barred. We do not, however, think that this is a correct interpretation of the Compensation Act. The intent and purpose of the section to which we have referred, and also of section 9 and subdivision ''E'' of section 11 would lead to the conclusion that at any time during the continuance of the injury, the insurance carrier might tender additional medical services, ask for an examination and present to the Commission the facts, if such facts exist, showing the necessity for a change in treatment or what treatment should have been given, which, if refused, would relieve the insurance carrier from liability under subdivision ''E'' of section 11 if so found by the Commission.

It follows from what we have said that the findings of the Commission and the award based thereon must be set aside, save and except as to the allowance to the petitioner of $16.17 weekly benefits and $25 attorney's fee, and the cause remanded for further proceeding, and it is so ordered.

Jamison, J., *pro tem.*, and Hart, Acting P. J., concurred.